UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| TRACY REDMOND, | : | Case No. 3:18-cv-00072 |
| --- | --- | --- |
| Plaintiff, | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

## DECISION AND ENTRY

**I.    Introduction**

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a disability, among other eligibility requirements. A disability in this context refers to "any medically determinable physical or mental impairment" that precludes an applicant from engaging in "substantial gainful activity." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Plaintiff Tracy Redmond applied for Disability Insurance Benefits and Supplemental Security Income in 2014, asserting her disability started on July 16, 2014 and continued thereafter. After preliminary denials of her applications, Administrative Law Judge Mark Hockensmith held a hearing and later denied Plaintiff's applications based on his conclusion that she was not under a disability. (Doc. #6, *PageID* #s 48-65).

Plaintiff brings the present case challenging ALJ Hockensmith's opinion on many grounds. She seeks an Order reversing ALJ Hockensmith's decision and remanding for payment of benefits.

The Commissioner finds no error in the ALJ's decision and asks the Court to affirm.

## II.  Background

On Plaintiff's asserted disability onset date, she was 44 years old—a younger person under social security law. She earned a high-school diploma and has worked in the past as a store laborer, a garment sorter, and an inspector/hand packager. Plaintiff testified during a hearing before ALJ Hockensmith that she had difficulty with work attendance due to fatigue and work-related stress. (Doc. #6, *PageID* #s 80-82).

Plaintiff's asserted disability centers on her mental-health problems. She suffers from severe depression that leaves her persistently tired. She testified, "It just makes me tired and I just can't function." *Id.* at 89. She also cries at least two or three times a day when no one is around. *Id.* at 90. In July 2015, Plaintiff began receiving treatment at Clearing Path Therapeutic Services, LTD. By the time of the ALJ's hearing, she had been in treatment with Clearing Path for about a year to a year-and-a-half for depression. Every two weeks she saw a counselor and every two months she saw a doctor. *Id.* at 57. Plaintiff's family physician prescribed Prozac for her because she "couldn't get any work done." *Id.* She also took medication daily that made her "sleepy." *Id.* at 58. Her additional

prescribed medications include Viibryd (Vilazodone),[1] Vistaril (Hydroxyzine), and Trazodone. *Id.* at 588, 592.

Her treatment at Clearing Paths Therapeutic Services, LTD (which started in July 2015) helped her feel "a little better." *Id*. at 89. Yet she would become angry and yell at everyone about twice a day. *Id*. at 91. She thinks she did this so she will be left alone. This happens to her 3 or 4 times a week. *Id*.

Plaintiff's anxiety level prevents her from driving more than about once a week. This anxiety stems from a bad truck accident she had about a year before the ALJ's hearing. *Id*. at 78-79. Either her husband or daughter take her places she needs to go.

During her typical day, she will get up and watch TV with her granddaughter or she will watch her granddaughter play in a room. She watches her granddaughter 2 or 3 days a week. She does not do the laundry often, and she does not cook much. *Id*. at 86. She has difficulty sleeping through the night. If she is not watching her granddaughter, she will sleep a lot during the day. *Id*. On days when she is not watching her granddaughter, she will just sit at home and watch TV or sleep. But she has difficulty concentrating and can only pay attention to a TV show for about 10 minutes. She also struggles to start and finish projects. *Id*. at 92.

Records from Clearing Paths report that in a diagnosis and assessment session on July 1, 2015, a counselor diagnosed her with severe depression and anxiety. *Id*. at 712. Plaintiff was dealing with the death of her newborn grandchild a month earlier. *Id*. at 712,

---

[1] *See* https://www.viibryd.com

3

714.[2]  She reported that she'd had depression all her life.  *Id*. at 714.  Plaintiff's treatment notes from Clearing House document her mental-status abnormalities such as a depressed mood, irritability, tearfulness, social isolation, decreased energy, and constant worry about children in her family.  *Id*. at 566-68, 571, 573, 578-79.

Six months before Plaintiff began treatment at Clearing Paths, psychologist Alan R. Boerger, Ph.D., examined Plaintiff.  *Id*. at 379-84.  Dr. Boerger diagnosed Plaintiff with dysthymic disorder.  He noted that Plaintiff's affect was appropriate to the situation and that she was "somewhat subdued and of low energy."  *Id*. at 382.  Dr. Boerger concluded that Plaintiff appeared capable of understanding and retaining instructions; she might have some difficulty with maintaining concentration and pace in work settings; she appeared to have a pattern of avoiding social interactions in social situations; and her depression might reduce her ability to tolerate work pressures in a work setting.  *Id*. at 384.

In January 2015—again, before Plaintiff began treatment with Clearing Paths— psychologist Blaine Pinaire, Ph.D. reviewed the administrative record for the state agency. He reported that Plaintiff's chronic depression and mental-health symptoms "limit her ability to tolerate work pressures and limit her coping skills."  *Id*. at 128.  He opined that despite Plaintiff's medically determinable impairments, she can understand, remember, and carry out simple instructions.  *Id*.  Dr. Pinaire also believed that Plaintiff could "make judgments that are commensurate with functions of unskilled tasks, i.e., work-related decisions; respond adequately to supervision, coworkers and work situations; and deal with

---

[2] Plaintiff testified about watching another granddaughter around the time of the ALJ's hearing in October 2016.

4

most changes in a routine setting. While there are some issues with concentration, there is sufficient concentration to perform simple 1-2 tasks, all on a routine and regular basis." *Id*.

Two months later, psychologist Lesley Rudy, Ph.D., reviewed the record and reached the same conclusions as Dr. Pinaire. *Id*. at 142-43.

In October 2016, Dr. Singh, a psychiatrist with Clearing Paths, completed a mental-impairment questionnaire. *Id*. at 719-22. He diagnosed Plaintiff with major depressive disorder ("MOD"), recurrent, severe, and without psychotic features. He wanted to rule out Lupus in light of Plaintiff's chronic fatigue. He identified Plaintiff's symptoms to include poor memory, appetite disturbance with weight changer, sleep disturbance, personality change, mood disturbances, emotional lability, recurrent panic attacks, anhedonia, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty concentrating, suicidal ideations, social withdrawal or isolation, flat or inappropriate affect, decreased energy, intrusive recollections of a traumatic experience, generalized persistent anxiety, and hostility and irritability. *Id*. at 719. He noted that Plaintiff's "depression and anxiety leave her bed bound at times 3-5 days per week, tearful daily, high anxiety daily, panic attacks 2x weekly, abusive environment (verbal), [and] anger." *Id*. at 720. He thought that Plaintiff's impairment had lasted for at least 12 consecutive months and that her symptoms exacerbate her fatigue/sleep. Dr. Singh concluded that Plaintiff's impairments or treatment would cause her to be absent from work more than three times a month. He noted that she was extremely limited in the following areas: restrictions in activities of daily living, difficulties in maintaining social functioning, ability to complete a normal workday and work week, ability to be aware of normal hazards and take appropriate precautions, and the ability to

travel in unfamiliar places or use public transportation. *Id*. at 721-22. She was markedly restricted in many additional areas, according to Dr. Singh. *Id*.

A vocational expert testified during the hearing ALJ Hockensmith held. He confirmed that an employee who is off task from work more than about 15% of an 8-hour workday could not maintain employment. *Id*. at 96. He further reported that employers typically do not tolerate more than about 1 day of absenteeism or tardiness per month. *Id*.

## III. ALJ Hockensmith's Decision

ALJ Hockensmith reviewed the evidence and evaluated Plaintiff's disability status under each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. §§ 404.1520, 416.920.[3] His more pertinent findings began at steps 2 and 3 where he found that although Plaintiff had severe impairments—depression and other health problems—her impairments did not automatically qualify her for benefits. (Doc. #6, *PageID* #s 51-57).

At step four, the ALJ concluded that the most Plaintiff could do (her residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)), consists of light work with 9 limitations. He found, for example:

> (1) no climbing ladders, ropes, or scaffolds…; (4) no work at unprotected heights…;(6) limited to simple, routine tasks performed in a static work environment with few changes in routine; (7) no fast paced work or strict production quotas; (8) no contact with the public; and [9] occasional contact with coworkers and supervisors.

*Id*. at 57. These limitations left Plaintiff unable to perform her past jobs.

---

[3] Further citations to social security regulations will identify the pertinent Disability Insurance Benefits regulation with full knowledge of the corresponding Supplemental Security Income regulation.

The ALJ concluded at step 5 that Plaintiff could adjust to other jobs—he did not say which jobs—that exist in significant numbers in the national economy. These main findings led the ALJ to ultimately conclude that Plaintiff was not under a disability and not eligible to receive Disability Insurance Benefits or Supplemental Security Income.

## IV. Standards of Review

Judicial review of ALJ Hockensmith's decision considers whether he applied the correct legal standards and whether substantial evidence supports his findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance…." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). It is evidence upon which a reasonable mind might accept as adequate to support a conclusion. *Blakley*, 581 F.3d at 406 (citation omitted). Caution is warranted, however, because "a decision of the Commissioner will not be upheld where the [Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F3d 541, 546-47 (6th Cir. 2004)).

## V. Discussion

Plaintiff contends that ALJ Hockensmith failed to reasonably weigh the opinions of her treating psychiatrist Dr. Singh and failed to meaningfully weigh the opinions of the state-agency-record reviewers, Drs. Pinaire and Rudy. She emphasizes that Dr. Singh's opinion is the only one in the record based on first-hand, longitudinal experience with Plaintiff. She also observes that Dr. Singh provided the most "contemporary assessment" of

the Plaintiff's mental-health difficulties. *Id*. at 739.

The Commissioner argues that the ALJ provided valid and reasonable justifications for placing little weight on Dr. Singh's opinions. The Commissioner maintains that the ALJ reasonably viewed Dr. Pinaire's and Dr. Rudy's opinions as generally consistent with the record evidence and discussed evidence elsewhere in his decision that supported his reliance on these record-reviewers' opinions.

Social Security Regulations require ALJs to adhere to certain standards when weighing the opinions provided by medical professionals. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014). If the treating medical source's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (citation omitted); *see Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting, in part, 20 C.F.R. §

8

404.1527(d)(2)).

"[T]he ALJ must provide 'good reasons' for discounting treating physicians' opinions, reasons that are ' sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting, in part, Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

In the present case, the ALJ placed little weight on Dr. Singh's opinions. He reasoned that Dr. Singh's assessments are inconsistent with his own mental status examination findings, as well as claimant's daily activities…." (Doc. #6, *PageID* #63). The ALJ observed that Dr. Singh appeared not to know about Plaintiff's "daily activity of taking care of her infant granddaughter several times a week." *Id*. This activity plus the activities she reported to Dr. Boerger and described during her testimony, "are inconsistent with an extreme limitation," in the ALJ's view.

The ALJ unreasonably posited that Dr. Singh appeared not to know about Plaintiff's ability to care for her infant granddaughter because he was surely well aware of the information in her treatment notes, including the note in December 2015 that says she was "getting to care for her grandchild during the day …." *Id*. at 701. More significantly, the ALJ draws a false parallel between caring for her granddaughter only 2 or 3 days a week and the abilities needed to complete an 8-hour workday, 5 days per week. Even assuming Plaintiff's babysitting constituted 3 full days of work per week, this is not comparable to full-time competitive employment. *See* Soc. Sec. Ruling 96-8p, 1996 WL 374184, *2 (defining residual functional capacity as the assessment of a person's ability to do sustained

9

work-related activities in a work setting on a regular and continuous basis, meaning "8 hours a day, for 5 days a week, or for an equivalent work schedule."); *cf.* 20 C.F.R. § 404.1572(c) ("Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity."). Plaintiff's activities, moreover, during the time she cared for her granddaughter did not equate with an ability to perform a full-time job. She testified that she rarely left her house with her granddaughter and instead they "mostly sit and watch TV or she'll play in the room." (Doc. #6, *PageID* #91). The food Plaintiff prepared for her granddaughter typically consisted of easily prepared food—"a hot dog or a ham and cheese sandwich." *Id*. at 92. Without more meaningful explanation, which the ALJ did not provide, it was unreasonable to find inconsistency between Plaintiff's intermittent and limited care for her granddaughter and Dr. Singh's opinions.

The ALJ also discounted Dr. Singh's opinions because Plaintiff "is cooperative with treating and examining sources, is able to grocery shop, and maintains stable relationships with family members…." *Id*. at 63. The fact that Plaintiff cooperates with treating and examining medical personnel is a to her credit and speaks favorably about the integrity of the information she provided during her treatment (with Dr. Singh) and her examination (by Dr. Boerger). There is, moreover, no indication in the record that Dr. Singh failed to consider Plaintiff's cooperation with treatment when forming his opinions about Plaintiff's mental-work limitations. And no medical source of record supports the connection the ALJ drew between Plaintiff's cooperation and the limitations Dr. Singh identified. The ALJ therefore discounted Dr. Singh's opinion based on his (the ALJ's) own lay opinion about the

10

significance of Plaintiff's cooperation during treatment. "An ALJ 'may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence.'" *Simpson v. Comm'r of Soc. Security*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Meece v. Barnhart,* 192 F. App'x 456, 465 (6th Cir. 2006)) and citing *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996) (stating "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); *see also Harvey v. Comm'r of Soc. Security*, No. 16-3266, 2017 WL 4216585, at *7 (6th Cir. 2017). Plaintiff, moreover, should not be penalized for cooperating with medical professionals.

The ALJ also relied on his own lay medical aptitude when discrediting Dr. Singh's opinions regarding Plaintiff's marked limitations in concentration, persistence, and pace. This appears where the ALJ advances the idea that normal test results of Plaintiff's cognition, knowledge, speech, and memory equate to normal attention, concentration, and pace. There are metaphorical apples and oranges here. Plaintiff's ability to think, remember, and speak are significantly different from her ability to focus, stay-on-task, work quickly, and reliably complete assigned tasks. And common meaning of these terms instructs that a person's ability to do the former (think, remember, and speak) do not guarantee success in the latter (focusing, staying on task, etc.). Without further explanation, which the ALJ did not provide, he drew a false equivalency between these two sets of abilities.

Even setting aside the foregoing problems, the ALJ erred in at least two other critical respects. First, he did not reasonably or substantively explain why a rejection of those

11

criticized portions of Dr. Singh's assessment merited rejecting other aspects of his opinions—especially his opinion about Plaintiff's frequent absenteeism. *See* Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *4 (July 2, 1996) ("[A]djudicators must always be aware that one or more of the opinions may be controlling while others may not"). Second, even if Dr. Singh's opinions failed to merit controlling weight, the applicable law obligated the ALJ to advance his analysis to a meaningful application of the deferential weight factors. *See see also Barbe v. Commissioner*, 3:13-cv-67, 2013 WL 6158404, *8 (S.D. Ohio 2013) (J. Black), *applying Blakely v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009) ("Even if the ALJ thought that [the treating physician's] opinions were not supported by the clinical diagnostic techniques and were inconsistent with other substantial evidence, he still needed to proceed to the deferential weight analysis."). "[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242. His failure to reasonably address this possibility was harmful considering that the deferential weight factors strongly support Dr. Singh as a valid source of opinion evidence.

Turning to the ALJ's review of the opinions provided by record reviewers Drs. Pinaire and Rudy, and one-time examiner Dr. Boerger, the ALJ placed significant weight on their opinions. Doing so, however, the ALJ applied less scrutiny to their opinions than he applied to Dr. Singh's opinions. *Compare* Doc. #6, *PageID* #s 61-62 *with PageID* #63. "A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Gayheart*, 710 F.3d at 379; *see Cottingim v. Comm'r of Soc. Sec.* No. 3:14cv121,2015 WL

12

2383520, at *5 (S.D. Ohio 2015) ("Simply restating the consultant's opinion and offering a conclusory assessment, without further discussion, fails to satisfy the requirement that the ALJ provide meaningful explanation of the weight given to all the medical opinion evidence.") *Report & Recommendations adopted*, 2015 WL 3606838 (2015). Further, Drs. Panaire and Rudy reviewed the administrative record before Plaintiff began treatment at Clearing House. It was error for the ALJ not to consider this. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) ("Where the non-examining source did not review a complete case record, we require some indication that the ALJ at least considered these facts before giving greater weight to an opinion from the non-examining source. (citation and quotation marks omitted)).

Accordingly, for the above reasons, Plaintiff's Statement of Errors in well taken.

## VI.  Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence 4 of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence 4 may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

Remand for an award of benefits is warranted in the present case because the evidence establishing Plaintiff's disability is overwhelming or is strong while contrary evidence is lacking. Dr. Singh's opinion—the only treating psychiatrist's opinion of records—stands essentially unrefuted because non-examiners Drs. Pinaire and Rudy reviewed a record that was far from complete and predated the records from Clearing House upon which Dr. Singh doubtlessly relied. The vocational expert—whose testimony is likewise unrefuted—testified that employers typically do not tolerate more than about 1 day of absenteeism or tardiness per month. *Id*. Viewing this together with Dr. Singh's opinion that Plaintiff would be absent more than 3 times per month due to her mental-health impairments and treatment, she is unable to engage in a substantial number of jobs that exist in the national economy. Consequently, she is under a disability and eligible for benefits based on her applications protectively filed on October 22, 2014

**IT IS THEREFORE ORDERED THAT**:

1. The Commissioner's non-disability decision on January 25, 2017 is vacated;

2. A finding is made that Plaintiff Tracy Redmond is under a disability and entitled to remand for payment of Disability Insurance Benefits and Supplemental Security Income based on her applications protectively filed on October 22, 2014; and,

3. The case is terminated on the Court's docket.

November 26, 2019

*s/Sharon L. Ovington*
Sharon L. Ovington
United States Magistrate Judge